NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ESTATE OF TARA O'LEARY, deceased, by Eileen Devlin and Coleen Winters, Co-Administratrices ad Prosequendum of the Estate of Tara O'Leary; ESTATE OF LYDIA JOY PERRY, deceased, by Vivian Kale and Janet Fandel, Co-Administratrices ad Prosequendum of the Estate of Lydia Joy Perry, | Civ. No. 12-2625<br><br>OPINION |
| Plaintiffs, | |
| v. | |
| DEBRA SLOAN, individually, and as agent, servant, and/or employee of the State Defendants and/or The ARC of Hunterdon County; STATE OF NEW JERSEY; DEPARTMENT OF HUMAN SERVICES-DIVISION OF DEVELOPMENTAL DISABILITIES; BRIDGET GRIMES, individually, and as agent, servant, and/or employee of the State Defendants; JENNIFER VELEZ, individually, and in her capacity as the Commissioner of the State Department of Human Services; MARION FENWICK, individually, and as agent, servant, and/or employee of the State Defendants; MARGE BRIEGEL, individually, and as agent, servant, and/or employee of the State Defendants and/or the ARC of Hunterdon County; KENNETH RITCHLEY, individually, and as agent, servant, and/or employee of the State Defendants and/or the ARC of Hunterdon County; ROBERT HARBOLD, individually, and as agent, servant, and/or employee of the State Defendants and/or the ARC of Hunterdon County; GERI MOHR, individually, and as agent, servant, and/or employee of the State Defendants and/or the ARC of Hunterdon County; THE ARC OF HUNTERDON COUNTY; JOHN & JANE DOES 1 – 50 (said names fictitious, real name | |

unknown), individually, and as policymakers, management, supervisors, agents, servants, and/or employees of the State Defendants, The ARC of Hunterdon County, or of the ABC CORPS. 1 – 10 (said names fictitious, real names unknown),

                 Defendants.

THOMPSON, U.S.D.J.

      This matter is before the Court upon the Motion for Summary Judgment of Defendants the State of New Jersey, the Department of Human Services-Division of Developmental Disabilities, Jennifer Velez, Marion Fenwick, Marge Briegel, Kenneth Ritchley, and Robert Harbold (collectively, the "State Defendants") (ECF. No. 36).  Plaintiffs the Estate of Tara O'Leary and the Estate of Lydia Joy Perry (collectively, "Plaintiffs") oppose.  (ECF No. 41).  Upon consideration of the parties' written submission and oral arguments, the Court will grant the State Defendants' Motion in part and deny it in part.

## I.      BACKGROUND

A.     FACTUAL BACKGROUND

      The present case stems from a tragic sequence of events that befell three women who lived in a Community Care Residence ("CCR") operated by Defendant Debra Sloan ("Sloan"). The three woman were Erin Germaine ("Germaine"), who is not a party to this action, Tara O'Leary ("O'Leary"), and Lydia Joy Perry ("Perry").  (ECF No. 41-5, Pls.' Statement of Facts, at ¶¶ 1–3).  Germaine, who has Cri-du-Chat syndrome and severe mental retardation, had begun living at the Sloan residence at age two and lived there until age thirty.  (*Id.* at ¶ 2; ECF No. 36-2, Def.'s Statement of Facts, at ¶ 5).  O'Leary, who suffered from profound mental retardation, a seizure disorder, and congenital scoliosis, lived at Sloan's residence for approximately twelve years.  (ECF No. 41-5, Pls.' Statement of Facts, at ¶ 1; ECF No. 36-2, Def.'s Statement of Facts,

at ¶ 6).  Perry, who had cognitive defects in the mild to moderate range, lived with Sloan for approximately eighteen months.  (ECF No. 41-5, Pls.' Statement of Facts, at ¶ 3; ECF No. 36-2, Def.'s Statement of Facts, at ¶ 7).  Perry had a developmental age of a six year old child.  (ECF No. 36-2, Def.'s Statement of Facts, at ¶ 170).

The New Jersey Department of Human Services-Division of Developmental Disabilities (the "DDD"), a Defendant in this case, operates the CCR program, in which private homes are licensed as residences for individuals with developmental disabilities.  (ECF No. 41-5, Pls.' Statement of Facts, at ¶ 4).  These individuals, such as Germaine, O'Leary, and Perry, are placed at CCR homes by the DDD and receive services there.  (*Id*.).  Sloan was first licensed to operate a CCR residence in her home in Bloomsbury, New Jersey in 1980.  (ECF No. 36-2, Def.'s Statement of Facts, at ¶ 3).  CCR licensees are expected to provide their residents with their basic needs and to ensure that they receive habilitative services and attend medical appointments.  (*Id*. at ¶ 4).  The contract that CCR licensees sign with the DDD permits the DDD to inspect the home monthly, and it requires the licensee to submit a monthly report to the DDD regarding the residents.  (ECF No. 41-5, Pls.' Statement of Facts, at ¶ 7).

In addition to services provided by the CCR licensee, the DDD provides care to CCR residents through its own employees.  A Habilitation Planning Coordinator, also known as a Case Manager, is the DDD employee with the most direct responsibilities to a CCR resident.  (ECF No. 36-2, Def.'s Statement of Facts, at ¶ 10).  Defendant Bridget Grimes ("Grimes") began working for the DDD as a Case Manager in 2001.  (*Id*. at ¶ 9).  During the relevant time period, Grimes was assigned thirty-eight clients, three of whom were O'Leary, Perry, and Germaine.  (*Id*. at ¶ 13).  A Case Manager is required to visit each CCR licensee's home monthly and to visit each resident in the licensee's home every other month.  (*Id*. at ¶ 10).  In connection with these visits, the Case Manager collects the monthly reports of the CCR licensee and submits her own

3

monthly reports regarding the CCR residents.  (ECF No. 41-5, Pls.' Statement of Facts, at ¶¶ 21, 23).  The Case Manager also leads the resident's interdisciplinary team ("IDT"), which creates the resident's Individual Habilitation Plan ("IHP").  (*Id.* at ¶¶ 11, 14).  The IHP is a written document that is prepared annually to outline the services that a CCR resident is to receive, including health care, education, and rehabilitation, and to lay out the resident's habilitative goals and steps to achieve those goals.  (*Id.* at ¶¶ 9, 12).  The IDT is composed of the assigned Case Manager, the CCR licensee of the home where the resident lives, other representatives of the DDD, representatives of any daycare program that resident attends, and the resident's family members or guardian.  (*Id.* at ¶ 11).

Each resident's IHP is prepared by the Case Manager and reviewed by the Case Manager's supervisor, whose title is Area Supervisor.  (*Id.* at ¶15; ECF No. 36-2, Def.'s Statement of Facts, at ¶ 14).  As an Area Supervisor in Hunterdon County, Defendant Marion Fenwick ("Fenwick") was Grimes' direct supervisor at all relevant times, and, in that capacity, she also oversaw two other Case Managers.  (ECF No. 41-5, Pls.' Statement of Facts, at ¶¶ 82–83).  Fenwick's supervisor was Defendant Marge Briegel ("Briegel"), the DDD's Hunterdon County Administrator, who directly oversaw three Area Supervisors, and, indirectly, twenty Case Managers.  (ECF No. 36-2, Def.'s Statement of Facts, at ¶ 17).  Briegel's supervisor was Defendant Robert Harbold ("Harbold"), the DDD's Regional Administrator for Hunterdon, Middlesex, Mercer, Monmouth, and Ocean Counties.  (*Id.* at ¶ 19).  Although the chain of command is unclear from the materials currently in the record, above Harbold were Defendant Kenneth Ritchley ("Ritchley"), the Assistant Commissioner of the DDD, and Defendant Jennifer Velez ("Velez"), the Commissioner of the Department of Human Services.  (ECF No. 1, Compl., at ¶¶ 13, 16).

Grimes had difficulty with Sloan from the time she began working as a Case Manager, including not being given access to the Sloan residence and not receiving the reports Sloan was supposed to submit.  (*Id*. at ¶¶ 78–79, 81).  Fenwick was aware of problems with Sloan as well: she knew before the year 2000 that Sloan sometimes did not send her CCR residents to their daycare programs (*id*. at ¶ 242); that she would intentionally disregard DDD mail (*id*. at ¶ 247); that she had become "paranoid" and had developed a "poor attitude" (*id*. at ¶ 249); that she was both financially strained and willing to flaunt the law, as she had misrepresented to the Hunterdon County Board of Social Services that she did not have heat in her home in order to receive financial assistance (*id*. at ¶ 246); that she sometimes prevented case managers from having their scheduled meetings with the CCR residents in the CCR residence (*id*. at ¶ 84); and that she sometimes did not submit monthly reports on her CCR residents as she was required (*id*. at ¶ 105).

Many CCR residents attend daycare programs where they receive habilitation services. (ECF No. 41-5, Pls.' Statement of Facts, at ¶ 27).  Per their IHPs, O'Leary and Germaine were supposed to attend the Point Breeze Day Program ("Point Breeze") operated by Defendant the ARC of Hunterdon County (the "ARC").  (*Id*. at ¶ 32).  Perry attended another daycare program. (ECF No. 36-2, Def.'s Statement of Facts, at ¶ 24).  O'Leary began attending Point Breeze in 2002.  (ECF No. 41-5, Pls.' Statement of Facts, at ¶¶ 39–40).  Though her IHPs indicated that she was supposed to attend the Point Breeze program five days a week, her attendance was sporadic from the start and became worse over time.  (*Id*. at ¶ 42).  Though their IHPs continued to state that they should attend the Point Breeze program, Sloan did not send O'Leary or Germaine there at all in the eighteen month period leading up to September 9, 2008.  (ECF No. 36-2, Def.'s Statement of Facts, at ¶ 23).  Perry, however, did attend her program during this time.  (ECF No. 41-5, Pls.' Statement of Facts, at ¶ 24).

5

Grimes became aware of O'Leary's daycare attendance problems in 2005 but did not know of their full extent until September 2008.  (*Id*. at ¶¶ 87, 95).  She reported these problems to Fenwick on several occasions.  (*Id*. at ¶¶ 84, 88). Fenwick, in turn, reported O'Leary's lack of attendance at the Point Breeze program to her supervisor Briegel.  (*Id*. at ¶ 111).  Despite Fenwick's knowledge that O'Leary was required to attend the Point Breeze program per her IHP, that O'Leary was to receive habilitation services there, and that O'Leary was not attending the program, Fenwick only ever had one meeting with Grimes to attempt to resolve this problem. (*Id*. at ¶¶ 123–24).

In July 2008, Perry reported to her daycare program crying because Sloan and her son had verbally abused her and threatened to kick her out of the Sloan residence.  (*Id*. at ¶ 141). Fenwick was made aware of this occurrence and interpreted it as an attempt by Sloan to drive Perry out of her residence so that she could receive a replacement CCR resident.  (*Id*. at ¶ 142). The only action Fenwick took was to instruct Grimes to tell Sloan that she could not receive another CCR resident until she began sending O'Leary and Germaine to Point Breeze regularly. (*Id*.).  Also, in Grimes' monthly report submitted at the end of July 2008, which Fenwick reviewed and signed off on, Grimes reported that O'Leary appeared to be "thin and w/o muscle mass," but neither Grimes nor Fenwick took any further action.  (*Id*. at ¶¶ 264, 271).

On September 9, 2008, when Sloan brought O'Leary and Germaine to Point Breeze for the first time in eighteen months, Point Breeze staffers immediately recognized that O'Leary and Germaine had suffered dramatic weight loss.  (*Id*. at ¶ 144–45).  This fact was reported to Grimes, who in turn reported it to Fenwick.  (*Id*. at ¶¶ 144, 159).  Fenwick advised Grimes to take O'Leary to her annual physical examination that was scheduled for September 11, but otherwise gave her no other instructions.  (*Id*. at ¶ 159).  The Point Breeze staff weighed O'Leary that day and found that her weight had dwindled from ninety-four pounds on November 27, 2007

6

to forty pounds.  O'Leary could not stand or walk even with assistance on that day, though she had been able to do so before the eighteen month absence.  (*Id*. at ¶ 156).

On September 11, 2008, the Point Breeze staff decided to call the police in anticipation of O'Leary and Germaine's arrival at the program that day to have them hospitalized rather than waiting for the DDD to address the problem.  (*Id*. at ¶ 157).  However, only Germaine was taken to Point Breeze on the 11th because O'Leary was being taken to her physical, and Germaine was indeed hospitalized that day.  (*Id*. at ¶ 158).  At O'Leary's physical, Grimes observed that O'Leary was "bone thin" under her layers of clothing, and she called Fenwick to report that fact.  (*Id*. at ¶ 160).  The DDD removed O'Leary, Germaine, and Perry from the Sloan residence later that day.  (*Id*. at ¶ 161).  O'Leary was placed in the Milford Group Home, but less than two weeks later she was admitted to Hunterdon Medical Center with nausea and vomiting.  (*Id*. at ¶¶ 162–63).  There, she was diagnosed with malnutrition and anemia, and she developed respiratory failure, pneumonia, septic shock, and obstructive hydrocephalus.  (*Id*. at ¶¶ 166–67).  Surgery was performed to treat the obstructive hydrocephalus, but O'Leary never recovered; her family removed her from life support on November 10, 2008.  (*Id*. at ¶ 168; ECF No. 36-2, Def.'s Statement of Facts, at ¶¶ 59–61).  She died that same day.  (ECF No. 41-5, Pls.' Statement of Facts, at ¶ 168).

When Perry was removed from the Sloan residence she was placed in a CCR residence maintained by Dot Purdy ("Purdy").  (*Id*. at ¶ 216).  The DDD had already been contemplating taking Perry from the Sloan residence and placing her in the Purdy residence; in that process, Purdy informed the DDD that she not want to take on Perry and that her placement with her would not be suitable.  (*Id*. at ¶ 214).  Nonetheless, the DDD proceeded to place Perry in the Purdy home.  (*Id*. at ¶ 216).  In 2006, Perry's physician had prescribed Perry to undergo a colonoscopy.  Perry's IHPs during the time she lived at the Sloan residence noted that she

needed to have this procedure; however, she did not have the colonoscopy until after she was removed from the Sloan residence.  (*Id*. at ¶¶ 182–83).  The results of Perry's colonoscopy and endoscopy revealed she suffered from "internal hemorrhoids, a sliding hiatal hernia and multiple erosions in her stomach, and Barrett's Esophagus."  (*Id*. at ¶ 187).  Perry ultimately died as a result of a gastrointestinal hemorrhage on August 17, 2009.  (*Id*. at ¶ 190).

 After O'Leary, Perry, and Germaine were removed from the Sloan residence, several investigations were launched.  (*Id*. at ¶¶ 220, 227, 294).  It was revealed that Perry had shared a bedroom with O'Leary and was forced to take care of O'Leary when O'Leary fell out of her bed, despite Perry's own physical limitations.  (*Id*. at ¶ 174).  A DHS investigator described the bedroom as having an unacceptable stench of urine.  (*Id*. at ¶195).  Detectives found a trash can in the center of the room containing soiled diapers, baby gates on the doors, and reversed bedroom door handles to keep Perry locked in the room with O'Leary.  (*Id*. at ¶ 196; ECF No. 36-2, Def.'s Statement of Facts, at ¶¶ 55–56).

 Among the other disturbing facts that were uncovered during the investigation of these events was that another CCR resident named Nadia Gilberte had died while living at the Sloan residence because of neglect.  (ECF No. 41-5, Pls.' Statement of Facts, at ¶ 303).  Additionally, investigators found that both O'Leary and Perry had been isolated to various extents from their families while at the Sloan residence.  Grimes and Fenwick were aware of the fact that O'Leary did not have a legal guardian for several years after her father died.  (*Id*. at ¶ 228).  Grimes stated in an email to Fenwick that the lack of a guardian "leaves Tara at risk."  (*Id*. at ¶ 229).  Grimes also prevented Perry's family from visiting her at the Sloan residence and concealed Sloan's name and address from them.  (*Id*. at ¶ 278).

 On October 30, 2009 a seventeen count criminal indictment was returned against Sloan and Grimes in Hunterdon County for their actions towards O'Leary, Perry, and Germaine,

including charges of official misconduct and neglect.  (ECF No. 36-2, Def.'s Statement of Facts, at ¶¶ 64–67).  In November 2011, Sloan pled guilty to five of these counts, and Grimes pled guilty to eight.  (*Id*. at ¶¶ 69–70).  Both were sentenced to three years imprisonment.  (*Id*.).

B.    PROCEDURAL HISTORY

As an initial matter, it is worth noting that the State Defendants' Motion for Summary Judgment is the first dispositive motion filed in this case.  None of the Defendants previously filed a motion to dismiss, and so this Opinion is the Court's first occasion to address the legal merits of Plaintiffs' claims and Defendants' immunities.[1]

The Complaint states ten counts against the State Defendants, Grimes,[2] Sloan, and the ARC of Hunterdon County.  (ECF No. 1, Compl., at ¶¶ 74–184).  Neither Grimes nor Sloan has filed an answer in this case or otherwise made an appearance.  Accordingly, this Opinion will not discuss any of the claims made against Grimes or Sloan individually, though Plaintiffs' arguments regarding whether the State Defendants are vicariously liable for the actions of Grimes and Sloan will be discussed below.  The ARC participated in the case and filed a motion for summary judgment (ECF No. 35); after this motion was filed, the ARC reached a settlement with Plaintiffs, and Plaintiffs voluntarily sought and were granted dismissal of the ARC.  (ECF No. 57, Order).  Because the ARC is no longer a party to the case, the Court will not analyze the

---

[1] The Court does note that Plaintiff, the Estate of Lydia Joy Perry, did file a complaint against many of the same Defendants in another docket, and that this Court issued an opinion on a motion to dismiss.  *See, generally, Estate of Lydia Joy Perry v. Sloan*, 10-cv-4646 (AET), 2011 WL 2148813 (D.N.J. May 31, 2011).  The parties agreed to the dismissal of that case without prejudice, so that the current complaint, which includes Plaintiff, the Estate of Tara O'Leary, could be filed in a new docket.  (*See* ECF No. 57, Docket No. 10-cv-4646).

[2] Though Grimes was an employee of the DDD, she is not represented by the State in this proceeding.

claims against the ARC.  Therefore, the Court will only assess Plaintiffs' claims against the State

Defendants in this opinion.[3]

Counts One and Two state claims under 42 U.S.C. § 1983 for violations of O'Leary and

Perry's substantive due process rights under the special relationship doctrine and the state-

created danger doctrine, respectively.  (ECF No. 1, Compl., at ¶¶ 74–108).  Count Three states

claims under 42 U.S.C. § 1983 for violations of O'Leary and Perry's procedural due process

rights through deliberate indifference and the establishment of unconstitutional polices, practices,

or customs.  (*Id*. at ¶¶ 109–16).  Count Four states claims for negligence.  (*Id*. at ¶¶ 117–29).

Count Five states claims under New Jersey's Wrongful Death Act and Survival Act.  (*Id*. at ¶¶

130–34).  In their Opposition brief, Plaintiffs state that they do not oppose summary judgment

being granted on this claim as to the Estate of Lydia Joy Perry; accordingly, judgment will be

granted to Defendants on that claim.  (ECF No. 41, Pls.' Opp'n Br., at 87).  However, Plaintiff

the Estate of Tara O'Leary does oppose Defendants' Motion on Count Five.  (*Id*.).  Count Six of

the Complaint states a claim against the State Defendants for violating O'Leary and Perry's

rights under the New Jersey Constitution.  (ECF No. 1, Compl., at ¶¶ 135–41).  Count Seven

states a claim for violations of the New Jersey Civil Rights Act.  (*Id*. at ¶¶ 142–48).  Count Eight

states claims for violations of the federal Americans with Disabilities Act and the New Jersey

Rehabilitation Act and Law Against Discrimination.  (*Id*. at ¶¶ 149–64).  Count Nine, a claim for

negligence against the ARC, is now moot, as the ARC has been dismissed.  Plaintiffs do not

oppose the motion for summary judgment on Count Ten, which is a claim based on a settlement

that the Plaintiffs reached with Dot Purdy whereby Purdy assigned her rights to indemnification

---

[3] For ease of reference, the Court will occasionally use the term "Defendants" to refer to the
"State Defendants," since the State Defendants are the only defendants being heard in this
motion.

from the State Defendants to Plaintiffs (*id.* at ¶¶ 182–84), and so judgment will be granted to Defendants on this Count.  (*See* ECF No. 41, Pls.' Opp'n Br., at 88).

In the Complaint, each of the State Defendants—the State of New Jersey, the Department of Human Services-Division of Developmental Disabilities, Jennifer Velez, Marion Fenwick, Marge Briegel, Kenneth Ritchley, and Robert Harbold—is stated as a defendant in each of these counts except Count Nine, which, as noted, is only stated against the ARC.

## II.   DISCUSSION

### A.   SUMMARY JUDGMENT LEGAL STANDARD

Summary judgment is appropriate if the record shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In deciding a motion for summary judgment, a district court considers the facts drawn from "the pleadings, the discovery and disclosure materials, and any affidavits" and must "view the inferences to be drawn from the underlying facts in the light most favorable to the party opposing the motion."  Fed. R. Civ. P. 56(c); *Curley v. Klem*, 298 F.3d 271, 276–77 (3d Cir. 2002) (internal quotations omitted).  In resolving a motion for summary judgment, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby*, 477 U.S. 242, 251–52 (1986).  More precisely, summary judgment should be granted if the evidence available would not support a jury verdict in favor of the nonmoving party.  *Id.* at 248–49.  The Court must grant summary judgment against any party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex,* 477 U.S. at 322.  Properly applied, Rule 56 will "isolate and

dispose of factually unsupported claims or defenses" before those issues come to trial.  *Id.* at 323–24.

B.    ELEVENTH AMENDMENT IMMUNITY

Defendants move for summary judgment on many of Plaintiffs' federal and state claims on the grounds that those claims are barred by the Eleventh Amendment.  (ECF No. 36-1, Defs.' Br., at 6–7).  The Eleventh Amendment of the Constitution provides:

> The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI.  This amendment "has been interpreted to make states generally immune from suit by private parties in federal court."  *MCI Telecomm. Corp. v. Bell Atlantic Pa.*, 271 F.3d 491, 503 (3d Cir. 2001) (citing *Board of Tr. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001); *College Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 669–70 (1999)); *Warner v. Pa.*, 569 Fed. App'x 70, 72 (3d Cir. 2014).  "This immunity extends to state agencies and departments" and the officers of state agencies acting in their official capacity.  *MCI Telecomm. Corp.*, 271 F.3d at 503; *Warner*, 569 Fed. App'x at 72; *Wilson v. Taylor*, 466 F. Supp. 2d 567, 574 (D. Del. 2006) (citing *Ky. v. Graham*, 473 U.S. 159, 169 (1985)).  Eleventh Amendment immunity applies to claims made under federal law as well as state law.  *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 104–06 (1984); *King v. Christie*, 981 F. Supp. 2d 296, 310 n.11 (D.N.J. 2013).

There are, however, several important exceptions to Eleventh Amendment immunity.  First, under the precedent established by *Ex Parte Young*, 209 U.S. 123 (1908), the Eleventh Amendment does not apply to suits seeking prospective injunctive relief and declaratory relief against state officials acting in their official capacity.  *Frew v. Hawkins*, 540 U.S. 431, 437 (2004); *Doe v. Div. of Youth & Family Services*, 148 F. Supp. 2d 462, 483 (D.N.J. 2001).  The

*Ex Parte Young* doctrine does not, however, provide immunity for state officials sued in their personal capacities for either federal or state law claims. *Ying Jing Gan v. City of New York*, 996 F.2d 522, 529 (2d Cir. 1993); *Wilson v. UT Health Ctr.*, 973 F.2d 1263, 1271 (5th Cir. 1992); *Torrey v. N.J.*, No. 13-1192-PGS, 2014 WL 941308, at *14 (D.N.J. March 11, 2014).

Additionally, Eleventh Amendment immunity does not apply where either there has been an abrogation of the immunity through a law passed by Congress pursuant to its legislative powers under § 5 of the Fourteenth Amendment (as opposed to its Article I powers), or where the state has waived its immunity. *MCI Telecomm. Corp.*, 271 F.3d at 503. It has long been established that Congress did not abrogate the states' Eleventh Amendment immunity when it passed 42 U.S.C. § 1983. *Quern v. Jordan*, 440 U.S. 332, 339–40 (1979); *Alston v. Kean Univ.*, 549 Fed. App'x 86, 89 (3d Cir. 2013). Also, it is beyond doubt that the State of New Jersey has not consented to suit in federal court for violations of 42 U.S.C. § 1983. *Alston*, 549 Fed. App'x at 89 (citing *Port Auth. Police Benevolent Ass'n v. Port Auth.*, 819 F.2d 413, 418 (3d Cir. 1987) *abrogated on other grounds by Hess v. Port Auth. Trans.–Hudson Corp.*, 513 U.S. 30 (1994)).

Thus, it is clear that the Eleventh Amendment bars any claims brought under § 1983 against the State of New Jersey, the DDD, and the individual State Defendants in their official capacities. Plaintiffs admit as much in their opposition brief. (ECF No. 41, Pls.' Opp'n Br., at 45). The Eleventh Amendment does not, however, bar § 1983 claims against the individual State Defendants in their personal capacity, and, in their opposition brief, Plaintiffs limit their § 1983 claims to actions taken by Defendants Briegel, Fenwick, and Grimes in their personal capacities. (*Id.*).

Plaintiffs also state claims against the Defendants for violations of the Americans with Disabilities Act ("ADA"). The Supreme Court has ruled that Congress did abrogate the states' Eleventh Amendment immunity through the passage of Title II of the ADA to the extent that it

13

creates a right of action to address behavior by the state that violates the Fourteenth Amendment. *U.S. v. Georgia*, 546 U.S. 151, 158–59 (2006).  Defendants do not address this case, nor the merits of Plaintiffs' ADA claims, in the Motion for Summary Judgment.  Because of the lack of briefing on the issue of whether the state actions that form the basis of Plaintiffs' ADA claims are violations of Fourteenth Amendment rights, the Court is not prepared to determine at this time whether the Eleventh Amendment provides immunity to the State of New Jersey, the DDD, and the individual defendants in their official capacities on this claim.  Accordingly, the Court must deny Defendants' motion for summary judgment on the ADA claim.

Lastly, because the State of New Jersey has not waived its Eleventh Amendment immunity with regard to state law claims, each of Plaintiffs' state law claims must be dismissed against the State of New Jersey, the DDD, and the individual defendants acting in their official capacities.  *See Hyatt v. Cnty. of Passaic*, 340 Fed. App'x 833, 837 (3d Cir. 2009) ("The [New Jersey Tort Claims Act], which allows suits against public entities and their employees in state court, does not expressly consent to suit in federal courts and thus is not an Eleventh Amendment waiver."); *Doe v. Div. of Youth & Family Servs.*, 148 F. Supp. 2d 462, 492 (D.N.J. 2001) (noting that the plaintiffs in that case had "not identified any provision of state law where New Jersey has expressly consented to suit in federal court under the LAD, the state common law or the New Jersey Constitution"); *Ritchie v. Cahall*, 386 F. Supp. 1207, 1209–10 (D.N.J. 1974).

C.    SUBSTANTIVE FEDERAL CLAIMS

*1. Count One, the Special Relationship Doctrine*

Count One of the Complaint states a claim under 42 U.S.C. § 1983 under the special relationship doctrine.  (ECF No. 1, Compl., at ¶¶ 74–90).  "Civil liability may be imposed under 42 U.S.C. § 1983 upon 'any person who, acting under the color of state law, deprives another of any rights, privileges, or immunities secured by the Constitution or the law of the United States.'

*Doe*, 148 F. Supp. 2d at 482 (quoting *Gruenke v. Seip*, 225 F.3d 290, 298 (3d Cir. 2000).

Defendants argue that they are entitled to qualified immunity on all of Plaintiffs' § 1983 claims.

(ECF No. 36-1, Defs.' Br., at 7–12). State actors are "entitled to such immunity if 'their conduct

does not violate clearly established statutory or constitutional rights of which a reasonable person

would have known.'" *Torisky v. Schweiker*, 446 F.3d 438, 442 (3d. Cir. 2006) (quoting *Wilson

v. Layne*, 526 U.S. 603, 609 (1999)).

In substantive due process caselaw, the special relationship doctrine is an exception to the

general rule established in *DeShaney v. Winnebago Cnty. Dept. of Soc. Servs.*, 489 U.S. 189

(1989) that state actors are not liable under § 1983 when third parties who are not state actors

cause the deprivation of the plaintiff's rights. *Deshaney*, 489 U.S. at 201 (finding that, even

though the defendant social workers may have known that placing plaintiff in custody of his

father created danger that plaintiff would be beaten by his father, defendants were not liable

under § 1983 because the injury was caused by a third party who was not a state actor, plaintiff

was not in the state's custody, and the state did not create the danger that befell plaintiff). Under

the special relationship doctrine, "[a] special relationship and a concomitant duty to protect

against private actions of third parties arises when the State engages in an 'affirmative act of

restraining the individual's freedom to act on his own behalf.'" *Black by Black v. Indiana Area

Sch. Dist.*, 985 F.2d 707, 713 (3d Cir. 1993) (quoting *D.R. by L.R. v. Middle Bucks Area

Vocational Technical Sch.*, 972 F.2d 1364, 1370 (3d Cir. 1992)). The Third Circuit has held that

the state has a special relationship with a person who is involuntarily committed to a mental

institute. *Black*, 985 F.2d at 713 (citing *Youngberg v. Romeo*, 457 U.S. 307 (1982)). In contrast,

the state does not ordinarily have a special relationship with a person who is voluntarily

committed to the state's custody because the state has not taken an affirmative act to restrain that

person's freedom.  *Torisky*, 446 F.3d at 446 (citing *Zinermon v. Burch*, 494 U.S. 113, 117–18 n.3 (1989)).

The Third Circuit, however, has recognized that under certain circumstances, a person who is voluntarily committed to the state's custody may become *de facto* involuntarily committed.  *Torisky*, 446 F.3d at 447 (noting that, in determining whether a person's custody should be considered voluntary or involuntary, "[c]ourts of appeals have looked to the particular facts of an individual's custody and, in particular, to whether the individual is free to leave state custody") (citing *Kennedy v. Schafer*, 71 F.3d 292, 295 (8th Cir. 1995); *Monahan v. Dorchester Counseling Ctr.*, 961 F.2d 987, 992 (1st Cir. 1992); *Walton v. Alexander*, 44 F.3d 1297, 1305 (5th Cir. 1995); *Brooks v. Giuliani*, 84 F.3d 1454, 1467–68 (2d Cir. 1996)).  Moreover, the existence of a special relationship that can be created through *de facto* involuntary commitment gives rise to an affirmative duty on the part of the state to ensure that the committed person is not deprived of her substantive due process rights to be cared for, protected, and offered habilitation services, as recognized by the Supreme Court in *Youngberg v. Romeo*, 457 U.S. 307 (1982).[4] *Torisky*, 446 F.3d at 443–46.  Thus, a person who is *de facto* involuntarily committed to the state's custody has a constitutional right to be cared for, protected, and offered habilitation services by the state, and that right was clearly established during the key events of this case. Accordingly, if Plaintiffs can prove that O'Leary and Perry were *de facto* involuntarily committed to the state's custody, Defendants must be denied qualified immunity, as Defendants

---

[4] In *Youngberg*, the Supreme Court found that the liberty interests of the plaintiff, who was mentally retarded and involuntarily committed to state custody, "require the State to provide minimally adequate or reasonable training to ensure safety and freedom from undue restraint." 457 U.S. at 319.  In addition to this right to habilitation services, the court found that the plaintiff's liberty interests also included the right to "adequate food, shelter, clothing and medical care" as well as "safe conditions" and "freedom from bodily restraint."  *Id.* at 315–16.  For ease of reference, these rights will be referred to as "*Youngberg* rights."

do not contest that O'Leary and Perry were denied their *Youngberg* rights while living at the Sloan residence.  (ECF No. 36-1, Defs.' Br., at 8).

While it appears that O'Leary and Perry were both initially committed voluntarily to the DDD's custody, it is possible for a jury to conclude, based on the evidence that Plaintiffs have presented, that they were *de facto* involuntarily committed because, by the time Sloan began depriving them of their *Youngberg* rights, they were not free to leave the DDD's custody.  In particular, O'Leary and Perry's level of disability; the length of time they had both been committed to custody in CCR homes; and their isolation from their family members and guardians could all lead a jury to conclude that O'Leary and Perry were *de facto* involuntarily committed to the DDD's custody.  (*See* ECF No. 41-5, Pls.' Statement of Facts, at ¶¶ 228–29, 278).  Accordingly, it is possible for a jury to conclude that some state actors had a special relationship with O'Leary and Perry which required those actors to ensure that third parties like Sloan were not depriving O'Leary and Perry of their *Youngberg* rights.  Accordingly, Defendants' motion for summary judgment on qualified immunity grounds will be denied on Count One.

### a. Defendants' Conduct

Even if Defendants are not entitled to qualified immunity on the special relationship claim, there is still the question of whether they are liable under § 1983.  A breach of the duty created by the special relationship occurs when "the state, 'under sufficiently culpable circumstances, [fails] to protect the health and safety of the citizen."  *Susavage v. Bucks Cnty. School Intermediate Unit No. 22*, 2002 WL 109615, at *9 (E.D. Pa. Jan. 22, 2002) (quoting *D.R.*, 972 F.2d at 1369).  The Third Circuit has explained that the state actor's conduct must "shock the conscience" when assessed in the "particular setting in which that conduct occurred."  *Nicini v. Morra*, 212 F.3d 798, 810 (3d Cir. 2000).

In a setting where a state actor has the time to "make unhurried judgments" and has the ability to "proceed[ ] in a deliberate fashion," the standard to be applied is deliberate indifference.  *Id*. at 810–11 (quoting *Miller v. City of Phila.*, 174 F.3d 368, 375 (3d. Cir. 1999); *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 853 (1998).  The Third Circuit has "defined 'deliberate indifference' as requiring 'conscious[ ] disregard [of] a substantial risk of serious harm.'"  *Robinson v. Peirce*, 586 Fed. App'x 831, 834 (3d Cir. 2014) (quoting *Ziccardi v. City of Phila.*, 288 F.3d 57, 66 (3d Cir. 2002) (alterations in original).  The deliberate indifference standard, as opposed to the gross negligence standard or the intent to cause harm standard, is often applied in the foster care context.  *Nicini*, 212 F.3d at 810.  Given that there is no question that state actors in this case had years to respond to reports that Sloan was depriving her CCR residents of habilitation services—Fenwick was aware of daycare attendance problems for Sloan's CCR residents before the year 2000 (ECF No. 41-5, Pls.' Statement of Facts, at ¶ 242)— the standard that will be applied here is deliberate indifference.  Thus, the question of whether any of the Defendants can be held liable under the special relationship theory becomes, in part, a question of whether they demonstrated deliberate indifference to the violations of O'Leary and Perry's rights in such a way that, in the context of the events of this case, "shocks the conscience."[5]  *Nicini*, 212 F.3d at 810 (citing *Cnty. of Sacramento v. Lewis*, 523 U.S. 833 (1998)).

---

[5] The Court notes that Count Three of the Complaint states a separate cause of action under 42 U.S.C. § 1983 for "DELIBERATE INDIFFERENCE -- Unconstitutional Policies/Practices/Customs and Procedural Due Process" (ECF No. 1, Compl., at ¶¶ 109–16). However, Plaintiffs' summary judgment opposition brief only discusses deliberate indifference as it relates to § 1983 claims in the context of the special relationship and state-created danger substantive due process claims.  Accordingly, the Court interprets the Plaintiffs to have abandoned Count Three of the Complaint, though such abandonment alone does not affect the viability of Counts One and Two.  Judgment will be awarded to Defendants on Count Three.

Drawing all inferences in the light most favorable to the Plaintiffs, the non-moving parties, the Court finds that Plaintiffs have put forward evidence that creates a genuine dispute as to whether Briegel and Fenwick were deliberately indifferent to deprivations of O'Leary and Perry's *Youngberg* rights.[6]  Plaintiffs point to evidence that Briegel and Fenwick were made aware that Sloan was causing O'Leary's absences from the Point Breeze daycare program where she was supposed to receive habilitation services and that they did little, if anything to address that problem.  (ECF No. 41-5, Pls.' Statement of Facts, at ¶¶ 84, 88, 111, 123–24).  Briegel and Fenwick were also made aware of Sloan's verbal abuse of Perry in July 2008 and did little or nothing to address that problem.  (ECF No. 41-5, Pls.' Statement of Facts, at ¶¶ 209–11).  Fenwick had been made aware that O'Leary was becoming emaciated in July 2008 (*id.* at ¶¶ 264, 271).  Despite this knowledge, Fenwick did nothing to end the threat to O'Leary and Perry that Sloan posed until September 11, 2008.  (*Id.*)  These facts could lead a reasonable jury to find that Briegel and Fenwick consciously disregarded the substantial risk that Sloan was depriving O'Leary and Perry of their *Youngberg* rights, and that their actions shock the conscience.  Accordingly, summary judgment will be denied to Defendants on this claim.

### 2. *Count Two, the State-Created Danger Doctrine*

The state-created danger doctrine is another exception to *DeShaney's* exemption of § 1983 liability for the actions of third-parties.  As with the special relationship doctrine, the state-created danger doctrine is premised on an understanding that the rule in *DeShaney* "does

---

[6] Though Plaintiffs have also discussed Grimes' conduct, there is no *respondeat superior* liability under § 1983, and so any actions that Grimes took cannot be attributed to Briegel or Fenwick; instead, Briegel and Fenwick's liability must be assessed only on the basis of their own personal actions.  *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988) ("A defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of *respondeat superior*.") (citing *Parratt v. Taylor*, 451 U.S. 527, 537 n.3 (1981); *Hampton v. Holmesburg Prison Officials*, 546 F.2d 1077, 1082 (3d Cir. 1976)).

not mean that no constitutional violation can occur when state authority is affirmatively

employed in a manner that injures a citizen or renders him 'more vulnerable to injury than he or

she would have been in the absence of state intervention.'"  *Bright v. Westmoreland Cnty.*, 443

F.3d 276, 281 (3d Cir. 2006) (quoting *Schieber v. City of Phila.*, 320 F.3d 409, 416 (3d Cir.

2003).  The elements of a state-created danger claim are:

> "(1) the harm ultimately caused was foreseeable and fairly direct;
> (2) a state actor acted with a degree of culpability that shocks the conscience;
> (3) a relationship between the state and the plaintiff existed such that the plaintiff
> was a foreseeable victim of the defendant's acts, or a member of a discrete class
> of persons subjected to the potential harm brought about by the state's actions, as
> opposed to a member of the public in general; and
> (4) a state actor affirmatively used his or her authority in a way that created a
> danger to the citizen or that rendered the citizen more vulnerable to danger than
> had the state not acted at all."

*Bright v. Westmoreland Cnty.*, 443 F.3d 276, 281 (3d Cir. 2006) (internal quotations and

citations omitted).  As with the special relationship doctrine, the Third Circuit has specified that,

when the state actors in question had time to "proceed deliberately" as opposed to having acted

in a "hyperpressurized environment," the standard to be applied to the second element of a state-

created danger claim is deliberate indifference.  *Phillips v. Cnty. of Allegheny*, 515 F.3d 224,

240–41 (3d Cir. 2008) (citing *Sanford v. Stiles*, 456 F.3d 298, 306 (3d Cir. 2006)).  As discussed

above, there was plenty of time for the state actors in this case to proceed deliberately, and so the

deliberate indifference standard will be applied.  *Phillips*, 515 F.3d at 241.

        The key differences between a state-created danger claim and a special relationship claim

are reflected in the third and fourth elements of the state-created danger claim: the victim of a

state-created danger claim need not have been involuntarily (or *de facto* involuntarily) committed

to the state's custody; however, in a state-created danger claim, the state actor must have acted to

make the victim more vulnerable to harm from a third-party, whereas the state has an affirmative

duty to protect the victim from harm from a third-party in a special relationship claim.  *Compare*

*Bright*, 443 F.3d at 281 *with Black by Black v. Indiana Area Sch. Dist.*, 985 F.2d 707, 713 (3d Cir. 1993).

Plaintiffs have provided enough evidence for a reasonable jury to find that all the elements of a state-created danger claim are met here against Fenwick.[7]  First, a reasonable jury could find that Fenwick was informed of enough warning signs to know that putting O'Leary and Perry in the care of Sloan put them at risk of deprivation of their *Youngberg* rights—at the very least, the right to habilitation services.  Fenwick was aware that Sloan sometimes prevented Grimes and the case managers who proceeded her from both having her scheduled meetings with the CCR residents placed in her home and from gaining access to the Sloan residence (ECF No. 41-5, Pls.' Statement of Facts, at ¶ 84); that Sloan had problems with sending CCR residents in her care to their daycare programs (*id*. at ¶ 242); that Sloan often did not submit the reports regarding her CCR residents that she was supposed to submit (*id*. at ¶ 105); that Sloan had misrepresented that she did not have heat in her home to the Hunterdon County Board of Social Services in order to receive financial assistance (*id*. at ¶ 246); that Sloan would intentionally throw away mail from the DDD that had been sent to her even in the presence of DDD case managers (*id*. at ¶ 247); and that in the two years leading up to 2008, that Sloan had become "paranoid" and had developed a "poor attitude" (*id*. at ¶ 249).  These facts are indications that Fenwick knew of a high likelihood that Sloan would not follow the DDD's rules in providing

---

[7] In contrast, Plaintiffs do not provide evidence that Briegel (or any of the other Defendants) was actually aware of any of these facts regarding Sloan before Sloan began abusing O'Leary and Perry; therefore, Briegel cannot have been deliberately indifferent to the threat that Sloan posed for the purposes of a state-created danger claim.  *See Phillips*, 515 F.3d at 238 ("To adequately plead foreseeability then, we require a plaintiff to allege an awareness on the part of the state actors that rises to the level of actual knowledge or an awareness of risk that is sufficiently concrete to put the actors on notice of the harm.").

care and services to CCR residents placed in her home, and that Sloan's malfeasance would amount to a deprivation of her CCR residents' *Youngberg* rights.[8]

Additionally, Plaintiffs have pointed to enough evidence for a reasonable jury to conclude that Fenwick affirmatively used her authority in a way that created a danger to O'Leary and Perry. As the Area Supervisor, Fenwick was responsible for supervising the Sloan residence as a CCR. (*Id*. at ¶ 99). She also had the responsibility to review and approve the IHPs of the CCR residents in her area, which specify the CCR homes in which the residents' are placed. (*Id*. at ¶¶ 8–11, 106; ECF No. 41-21, Whalen Ex. 4-1, at 1, 6). Fenwick was also aware that the DDD had a policy in place to remediate CCR licensees, which she could have implemented as Area Supervisor, and that Sloan's refusal to meet with Case Managers, her failure to submit reports, and her CCR residents' absences from their daycare programs should have triggered the implementation of the remediation policy. (ECF No. 41-5, Pls.' Statement of Facts, at ¶¶ 129–135). When Fenwick was alerted that Sloan told Perry that she would kick Perry out of her home, Fenwick instructed Grimes to tell Sloan that she could not receive another CCR resident until O'Leary and Germaine began attending the Point Breeze program. (ECF No. 41-5, Pls.' Statement of Facts, at ¶¶ 141–42). All of these facts indicate that Fenwick, in her capacity as Area Supervisor, exercised some control over Sloan's ability to continue to operate as a CCR licensee and in O'Leary and Perry's placement in Sloan's residence.

Fenwick's awareness of the danger Sloan posed to O'Leary and Perry and her use of her authority to allow O'Leary and Perry to be placed in Sloan's care constitute the fourth elements of a state-created danger claim. The first element is met here because the harm O'Leary and

---

[8] There is also evidence in the record that another person named Nadia Gilberte ("Gilberte") had died while a CCR resident at Sloan's home because of Sloan's neglect before O'Leary and Perry lived there. (ECF No. 41-5, Pls.' Statement of Facts, at ¶ 303). However, Plaintiffs do not point to any evidence indicating that any of the Defendants in this case knew about Gilberte.

Perry suffered was abuse and neglect at the hands of Sloan, which was foreseeable and flowed directly from Fenwick's annual approval of their placement with Sloan.  The third element is similarly met because, as CCR residents, O'Leary and Perry were clearly foreseeable victims of the abuse and neglect of a CCR licensee such as Sloan.  Drawing all inferences in favor of the Plaintiffs, the Court finds that, given the plethora of warning signs regarding Sloan and the long period of time that Fenwick was aware of these warnings signs—before the year 2000—a reasonable jury could determine that Fenwick consciously disregarded the serious risk of harm to the CCR residents in Sloan's care, thus constituting deliberate indifference that shocks the conscience.  Accordingly, Plaintiffs have properly demonstrated all the elements of a state-created danger claim.  Defendants do not dispute that the substantive due process right to be free from a state-created danger was clearly established; accordingly, Defendants' motion for summary judgment on the state-created danger claim in Count Two against Fenwick on qualified immunity grounds and substantive grounds will be denied.

D.    STATE LAW CLAIMS

    *1. Immunities for Defendants in their Individual Capacity*

    *a) The Tort Claims Act*

The analysis of whether any of the Defendants may be held liable under New Jersey state law requires an analysis of New Jersey's Tort Claims Act, N.J.S.A. 59:1–1 to 14-4 (the "TCA"). The New Jersey Supreme Court has summarized the basic mechanics of the TCA as follows:

> The primary liability imposed on public entities is that of *respondeat superior*: when the public employee is liable for acts within the scope of that employee's employment, so too is the entity; conversely, when the public employee is not liable, neither is the entity. Public employees are liable under the [TCA] in the same manner as private individuals, unless there is an immunity provided by law (including the [TCA]); and the public employee's liability is subject to any defenses that would be available were he a private person.  The liability of the public entity must be found in the [TCA], and where found, is subject to any immunity found in the [TCA] and further subject to any immunity previously

established by common law. Liability of the public employee, however, may be found either in the [TCA] or at common law but it too is subject to the immunities of the [TCA] and the common law.  When both liability and immunity appear to exist, the latter trumps the former.

*Tice v. Cramer*, 627 A.2d 1090, 1094–95 (N.J. 1993) (internal citations omitted).

Additionally, the New Jersey Supreme Court has noted that the TCA was passed by the New Jersey State Legislature "to reestablish a system in which immunity is the rule, and liability the exception." *Bombace v. City of Newark*, 593 A.2d 335, 372 (N.J. 1991).  In keeping with that general purpose, the drafters of the TCA specifically "caution[ed] courts to 'exercise restraint in the acceptance of novel causes of action against public entities.'" *Saldana v. DiMedio*, 646 A.2d 522, 527 (N.J. Super. Ct. App. Div. 1994) (quoting Comment, N.J.S.A. 59:2–1).

*b) Immunity under N.J.S.A. 59:3–5*

Defendants argue that they should be immune from any liability under N.J.S.A. 59:3–5,[9] which states: "A public employee is not liable for injury caused by his adoption of or failure to adopt any law or by his failure to enforce any law."  Essentially, Defendants' argument is that Defendants were required to protect O'Leary and Perry by law; Plaintiffs claim that Defendants failed to protect O'Leary and Perry; thus Plaintiffs' are seeking to impose liability on the state for failure to enforce a law.

While Defendants cite a number of cases that apply this provision of the TCA in finding that the public employees are immune, all of those cases are distinguishable because they involve a claim that the plaintiff suffered damages as a result of the state actors' failure to enforce a

---

[9] N.J.S.A. 59:2-4 is a corollary of N.J.S.A. 59:3-5, and it states that a public entity may not be directly liable for failure to enforce a law.  Because, as discussed above, Plaintiffs cannot maintain state law claims against the State of New Jersey or the DDD directly in this case, the Court will primarily refer to immunity for failure to enforce a law as immunity under N.J.S.A. 59:3-5.

specific legal provision.[10]  For instance, in *Doe v. Div. of Youth & Family Serv.*, 148 F. Supp. 2d

462 (D.N.J. 2001), the court ruled that the defendant, an employee of the New Jersey Division of

Youth and Family Service ("DYFS"), was shielded by the TCA when the plaintiff's allegations

amounted to allegations that the employee "fail[ed] to enforce state law requiring an

investigation of abuse and neglect complaints." *Doe*, 148 F. Supp. 2d at 494.  Here, Plaintiffs

have alleged that the Defendants were negligent in their performance of their duties toward

O'Leary and Perry, not that they failed to perform any certain duties or failed to enforce any

certain laws.[11]  This is the difference highlighted by the court in *K.J. ex rel. Lowry v. Div. of*

*Youth & Family Serv.*, 363 F. Supp. 2d 728, 748–49 (D.N.J. 2005).  There, the plaintiffs brought

claims against DYFS for negligence in how the agency oversaw their placement in an adoptive

home.  The defendants argued that they were immune under N.J.S.A. 59:2–4, but the court

disagreed, stating:

---

[10] *Levin v. Cnty. of Salem*, 133 N.J. 35, 43 (1993) (county and cities immune for failing to adopt or enforce ordinance against jumping off a bridge into shallow water); *Bombace v. City of Newark*, 125 N.J. 361, 367 (1991) (city and city employees immune for failing to enforce regulations pertaining to smoke detectors and heating system in rental property); *Reaves v. State*, 303 N.J. Super. 115 (App. Div. 1997) (state, state agency, and state employees immune for failure to conduct a timely investigation of a complaint of discrimination); *Perona v. Twp. of Mullica*, 270 N.J. Super. 19, 29–30 (App. Div. 1994) (township and its police officers immune for failing to follow proper protocols when dealing with an individual who displayed intention of committing suicide); *Garry v. Payne*, 224 N.J. Super 729, 734–36 (App. Div. 1988) (city immune for failing to perform adequate inspections); and *Kenney v. Scientific, Inc.*, 204 N.J. Super. 228, 237 (App. Div. 1985) (state immune for failing to regulate landfill).

[11] The following example is illustrative of the difference here: assume that the state has a law requiring the presence of a lifeguard to rescue any person who is drowning at any state park with swimming facilities.  On a certain day there is no lifeguard present at a park in the state, and an individual drowns there.  Under these circumstances, the state would be immune from suit under N.J.S.A. 59:2-4 because it simply failed to enforce the law mandating the presence of a lifeguard. *See Levin v. Cnty. of Salem*, 133 N.J. 35, 43 (1993).  However, if there was a lifeguard present on that same day who was negligent in her performance of her duties, that lifeguard would not be immune under N.J.S.A. 59:3-5 even though, arguably, her actions could be construed as a failure to enforce the law to rescue the drowning victim. *See K.J. ex rel. Lowry v. Div. of Youth & Family Serv.*, 363 F. Supp. 2d 728, 748–49 (D.N.J. 2005)

> Plaintiffs have alleged claims for failure by the agency to fulfill its duties in oversight over the child placement process.  The claims do not seek damages for the failure of any agency to enforce regulations or to provide law enforcement. *See, e.g., Saldana v. DiMedio*, 275 N.J. Super. 488, 646 A.2d 522 (1994) (distinguishing between negligence claims and claims against the government serving in its "role as enforcer of laws.")  Instead, the activities alleged fall outside the scope of the limited exception to New Jersey's waiver of sovereign immunity for enforcement of the law.

363 F. Supp. 2d at 748–49.  Similarly, here Defendants are attempting to bootstrap themselves behind the TCA's shield of immunity by claiming that state law required O'Leary and Perry to be protected by DDD employees, thus these same employees cannot be liable for failing to protect O'Leary and Perry.  Accepting this argument would allow public employees to escape liability in most, if not all, situations, which is clearly contrary to the purposes of the TCA.  If Plaintiffs' case rested solely on an argument that there was a single specific law or regulation that Defendants did not comply with, and that all of O'Leary and Perry's injuries flowed from that non-compliance, it may well be that Defendants would be immune under N.J.S.A. 59:3–5. However, here, Plaintiffs have alleged a long pattern of negligence on the part of Defendants with regard to O'Leary and Perry; therefore, Defendants are not immune to these claims under the TCA for failure to enforce the law.

c) *Immunity under N.J.S.A. 59:3–2*

Defendants also move for summary judgment based on immunity under N.J.S.A. 59:3–2(d), which provides that "A public employee is not liable for the exercise of discretion . . . unless a court concludes that the determination of the public employee was palpably unreasonable."  This statutory provision specifies, however, that it only applies to discretionary, as opposed to ministerial, duties: "Nothing in this section shall exonerate a public employee for negligence arising out of his acts or omissions in carrying out his ministerial functions." Plaintiffs do not contest that N.J.S.A. 59:3–2(d) provides immunity to Defendants Velez,

Ritchley, and Harbold for their actions in this case.  (ECF No. 41, Pls.' Opp'n Br., at 5).

Accordingly, summary judgment will be granted on this ground as to all state law claims against

these three defendants except Plaintiffs' claims under the New Jersey Constitution and the New

Jersey Civil Rights Act.  *Major Tours, Inc. v. Colorel*, 720 F. Supp. 2d 587, 611 (D.N.J. 2010)

("The [TCA] does not grant public employees immunity from suits under rights of action

provided by the New Jersey Constitution, nor from suits under the [New Jersey Civil Rights

Act].") (citing *Owens v. Feigin*, 947 A.2d 653 (N.J. 2008); *Garlanger v. Verbeke*, 223 F. Supp.

2d 596, 604 (D.N.J. 2002)).

Plaintiffs do contest the application of the TCA's discretionary immunity to Defendants

Briegel and Fenwick, however.  Defendants claim that any relevant actions taken by Briegel and

Fenwick were discretionary and not palpably unreasonably.  The difference between a

ministerial and a discretionary act for the purposes of the TCA has been described as follows by

the New Jersey Superior Court, Appellate Division:

> A ministerial act is one which is performed under a given state of facts in a
> prescribed manner without regard to or the exercise of judgment upon the
> propriety of the act being done.  On the other hand, the exercise of discretion
> contemplated by [the TCA] refers to actual, high-level policymaking decisions
> involving the balancing of competing considerations.

*Allen v. Flynn*, 2011 WL 3425626, at *6 (N.J. Sup. Ct. App. Div. Aug. 8 2011) (internal citations

and alterations omitted).

Defendants admit, however, that if "Briegel or Fenwick had been aware of the alleged

abuse of O'Leary and Perry and failed to act" that their actions would "rise to the level of

palpably unreasonable."  (ECF No. 36-1, Defs.' Br., at 17).  As discussed in the context of

Plaintiffs' § 1983 special relationship claim, there is evidence that Briegel and Fenwick were

aware that Sloan was causing O'Leary to be absent from the Point Breeze program, that Sloan

had verbally abused Perry, that Fenwick was aware that O'Leary was becoming emaciated, and

that neither Briegel or Fenwick took any serious effort to address these problems. (ECF No. 41-5, Pls.' Statement of Facts, at ¶¶ 84, 88, 111, 123–24, 209–11, 264, 271).  Accordingly, regardless of whether Briegel and Fenwick's actions were discretionary or ministerial, on Defendants' own admission, a reasonable jury could find that Briegel and Fenwick acted palpably unreasonably, and thus summary judgment will be denied to Defendants on the claim that Briegel and Fenwick are immune under N.J.S.A. 59:3–2.

      *2.  The State's Vicarious Liability for Grimes and Sloan*

      *a)  Grimes*

      Plaintiffs argue that the DDD is vicariously liable for certain acts of "ordinary negligence" that Grimes committed.  (ECF No. 41, Pls.' Opp'n Br., at 32).  Plaintiffs concede that the DDD is generally protected from liability for Grimes' criminal acts under N.J.S.A. 59:2–10, which states, "A public entity is not liable for the acts or omissions of a public employee constituting a crime, actual fraud, actual malice, or willful misconduct."  However, Plaintiffs argue that these acts of ordinary negligence are somehow outside of Grimes' criminal conduct and do not otherwise constitute "actual fraud, actual malice, or willful misconduct," and therefore, that the DDD is vicariously liable.  Plaintiffs urge the Court to view Grimes' behavior as a progression from the merely negligent to the criminal, and they posit that the DDD is liable for Grimes' conduct before the moment when her criminal behavior began.  (ECF No. 41, Pls.' Opp'n Br., at 35).

      Plaintiffs do not cite any cases finding that a public entity is liable for acts of negligence committed against a victim by one of its employees who also committed criminal acts against the same victim.  Plaintiffs do cite to two cases for support of their theory, but each is distinguishable from the present case.  In *J.H. v. Mercer Cnty. Youth Det. Cntr.*, 930 A.2d 1223, 1233 (N.J. Super Ct. App. Div. 2007), the New Jersey Appellate Division ruled that the Mercer

County Youth Detention Center was not immunized under N.J.S.A. 59:2–10 for conduct of its employee when the conduct was a violation of the Child Sexual Abuse Act ("CSAA"). The Appellate Division based its ruling in a large part on the fact that the CSAA was first adopted in 1992, while the TCA had been adopted in 1972, and that the CSAA therefore abrogated the TCA on the issue of child sexual abuse. *Id.* at 1232–33. Here, Plaintiffs argue that the DDD is liable for Grimes' acts constituting common law negligence against O'Leary and Perry, and so the Appellate Division's ruling in *J.H.* is inapplicable.

The other case Plaintiffs cite is *Kelley v. Curtis*, 102 A.2d 471 (N.J. Super. Ct. App. Div. 1954) *rev'd on other grounds, Kelley v. Curtis*, 108 A.2d 431 (N.J. 1954). In their Opposition Brief, Plaintiffs state that this case stands for the proposition that "Even though last event [sic] in a sequence may be immunized, that does not render the prior [negligent] act immune. If the earlier acts could be a basis for liability, they are not immunized because a later act/event is immunized." (ECF No. 41, Pls.' Opp'n Br., at 36) (alteration in original). The Court reads *Kelley* differently, however. There, the Appellate Division was expounding on a pre-TCA rule of municipal liability in New Jersey that held that a municipality could only be liable for "active wrongdoing." *Kelley*, 102 A.2d at 472. The issue in the case was whether the City of Newark was liable when a police officer negligently left a horse in a driveway unattended, where it kicked Mrs. Kelley. *Id.* The City's argument was that because the police officer had committed an act of negligence, there had been no active wrongdoing. *Id.* at 474. The Appellate Division rejected this argument, stating first that "a 'negligent act of commission' is active wrongdoing. *Id.* Then, in the language that Plaintiffs in the present case have summarized in their Brief, the Appellate Division stated

> To be active, there must a 'positive affirmative act.' In other words, in the sequence of events each of which becomes a proximate cause of the injury, there must be a wrongful act (as distinguished from a mere failure to act) on the part of

> some municipal officer, agent or servant.  The last event in that sequence may be
> non-action; but that does not render the prior act immune.

*Id*. (internal citations omitted).  Thus, properly understood, the Appellate Division's remarks

concern principles of tort law and the issue of whether an act of negligence can be construed as

"active" more than they have anything to do with municipal liability.  Additionally, and much

more to the point, the *Kelley* case is wholly inapplicable to the present case, as it was decided

well before the passage of the TCA and does not address the issue of whether N.J.S.A. 59:2–10

shields a public entity from liability for its employee's negligence where the same employee

committed criminal acts.

Thus, there is no precedent on point to support Plaintiff's theory of liability.  That fact,

combined with New Jersey precedent that holds that immunity is the rule under the TCA and

liability the exception, and the fact that the drafters of the TCA cautioned against accepting novel

causes of action against public entities, means that this Court cannot read N.J.S.A. 59:2–10 as

narrowly as Plaintiffs urge.  *See Bombace v. City of Newark*, 593 A.2d 335, 372 (N.J. 1991);

*Saldana v. DiMedio*, 646 A.2d 522, 527 (N.J. Super. Ct. App. Div. 1994) (quoting Comment,

N.J.S.A. 59:2–1).  Accordingly, the Court will reject the analytical framework that Plaintiffs

have suggested—to identify a specific time when Grimes' criminal conduct began and her

merely negligent conduct ended—and will instead focus on whether the behavior Plaintiffs' have

alleged to be negligent was encompassed within Grimes' criminal conduct.

Plaintiffs identify four acts of negligence that they claim are not encompassed within

Grimes' criminal conduct: (1) Grimes' failure to take action to ensure a legal guardian was

appointed for O'Leary; (2) Grimes' misunderstanding of the rules of family visits with regards to

O'Leary's family; (3) Grimes' failure to report a series of incidents to Perry's family; and (4)

Grimes' failure to report to the Perry family that the Purdy residence was a mismatch for Perry. (ECF No. 41, Pls.' Opp'n Br., at 32–33).

On October 30, 2009, a grand jury in Hunterdon County returned a seventeen count indictment against Grimes.  *See* Indictment, *New Jersey v. Sloan*, Indictment No. 09-10-00390-I (Hunterdon Cnty Law Div. Oct. 30, 2009).[12]  On September 26, 2011, Grimes pled guilty to Counts Four, Six, Eight, Nine, Ten, Eleven, Fourteen, and Fifteen of the indictment.  (Doc. No. 41-17, Kahn Ex. L, at 4).  These counts included the following charges:

> **Count 4       Official Misconduct                    2nd Degree**
> [That Grimes] did knowingly refrain from performing a duty imposed upon her by law or clearly inherent in the nature of her office, that is, knowingly acted as an accomplice in neglecting and/or assaulting and/or restraining Tara O'Leary and/or committing a theft from Tara O'Leary and/or violating laws that protected the health and safety of Tara O'Leary . . . .
>
> **Count 8       Official Misconduct                    2nd Degree**
> [That Grimes] did knowingly refrain from performing a duty imposed upon her by law or clearly inherent in the nature of her office, that is, knowingly acted as an accomplice in neglecting Lydia Joy Perry . . . .
>
> **Count 9       Neglect of an Elderly or Disabled Person  3rd Degree**
> [That Grimes] having a legal duty for the care of Tara O'Leary . . . did not fully comply with [O'Leary's] individualized habilitation plan, and/or did fail to provide proper medical treatment in a timely fashion and/or did deny family members access to her home and the ability to seek guardianship . . . .
>
> **Count 11      Neglect of an Elderly or Disabled Person  3rd Degree**
> [That Grimes] having a legal duty for the care of Lydia Joy Perry . . . did deny family members access to her home . . . .

Indictment, *New Jersey v. Sloan*, Indictment No. 09-10-00390-I, at 2, 4–5 (Hunterdon Cnty Law Div. Oct. 30, 2009).  Additionally, in her plea colloquy, Grimes was asked the following question and gave the following answer:

---

[12] Though no party submitted the joint indictment of Sloan and Grimes, it is a public record which the Court may consider on a motion for summary judgment.  *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1197 (3d Cir. 1993); *Doe v. Hesketh*, 2015 WL 115723, at *6 (E.D. Pa. Jan. 9, 2015).

> Mr. Whittlesey [Grimes' attorney]:   Do you understand that in the course of your employment there were times and opportunities that you could have facilitated certain things as to Ms. Perry, such as medical examinations, such as possibly assisting with family members meeting or coming out to have access to Ms. Perry, and you're acknowledging by virtue of your guilty plea that you did not do so.  Correct?
>
> The Defendant [Grimes]:       Correct.

(ECF No. 41-17, Kahn Ex. L, at 17–18.)

The Court finds that the negligent acts that Plaintiffs have alleged against Grimes are either encompassed in the criminal charges that Grimes pled guilty to or are behavior that Grimes admitted to in her plea colloquy.  The Court notes that as a general matter of tort law, in order to find a person liable for negligence, there must be a duty of care owed by the putative tortfeasor to the victim.  *Robinson v. Vivirito*, 86 A.3d 119, 124 (N.J. 2014); *Polzo v. Cnty. of Essex*, 960 A.2d 375, 384 (N.J. 2008).  "The issue of whether a defendant owes a legal duty to another and the scope of that duty are generally questions of law for the court to decide." *Robinson*, 86 A.3d at 124.  As a general matter, a person does not owe an affirmative duty to protect another person; there must be some special relationship or status between the two people that creates the duty, such as a business owner and patrons invited onto her property.  *Matute v. Lloyd Bermuda Lines, Ltd.*, 931 F.2d 231, 237 (3d Cir. 1991) ("Liability for negligence, however, can never arise absent some duty."); *Robinson*, 86 A.3d 124–25.  Here, to the extent Grimes had a duty to protect O'Leary that Perry, that duty was created by Grimes' status as a DDD employee.  Grimes was charged with failing in the official duties she owed to O'Leary and Perry and to not involving O'Leary and Perry's families in their care to the extent she was required to do so as part of her official duties.  Each of Plaintiffs' claims for negligence are thus encompassed in Grimes' criminal conduct, and thus the DDD is immune from liability for those acts under N.J.S.A. 59:2–10.  Summary judgment on these claims is granted to Defendants.

*b) Sloan*

Defendants move for summary judgment on Plaintiff's claim that the DDD is vicariously liable for Sloan's actions on the grounds that Sloan is effectively an employee of the DDD. As discussed above, the general scheme for the TCA is that a public entity is vicariously liable for injuries caused by its employees that occur within the employee's scope of employment. N.J.S.A. 59:2–1, 2–2. An employee is defined as "an officer, employee, or servant, whether or not compensated or part-time, who is authorized to perform any act or service; provided, however, that the term does not include an independent contractor." N.J.S.A. 59:1–3. Here it is undisputed that Sloan had a contract with the DDD that labeled her an independent contractor. When faced with the question of whether persons labeled as independent contractors should nonetheless be considered employees or servants of a state entity, New Jersey courts applied the control test. *New Jersey Property-Liability Ins. Guar. Ass'n v. State*, 477 A.2d 826, 828–29 (N.J. Super. Ct. App. Div. 1984). "Under the control test, 'the relation of the master and servant exists whenever the employer retains the right to direct the manner in which the business shall be done, as well as the result to be accomplished, or in other words, not only what shall be done, but how it shall be done.'" *Id*. at 828 (quoting *Errickson v. Schwiers Co.*, 158 A. 482 (E. & A. 1931). Thus, if Sloan can be considered a public employee, it must be because the DDD exercised such significant control over Sloan as a CCR licensee that it effectively formed a master-servant relationship.

No court in New Jersey has addressed whether a CCR licensee can be considered a servant of the DDD for purposes of the TCA. However, there are two cases in New Jersey that have held that foster parents are not considered public employees under the TCA: *New Jersey Property-Liability Ins. Guar. Ass'n v. State*, 477 A.2d 826, 833 (N.J. Super. Ct. App. Div. 1984) and *Stanley by Stanley v. State Indus., Inc.*, 630 A.2d 1188, 1190–91 (Essex County Ct. 1993).

Though Plaintiffs argue that these cases are distinguishable on the master-servant issue, the Court disagrees with Plaintiffs and finds that the ruling in those cases is applicable here. First, the New Jersey Supreme Court has recently noted that holding a public entity liable for the negligence of a non-public employee is "contrary to the purpose of the TCA," and so finding a non-public employee to be an agent of the state should be the exception, not the rule. *Robinson v. Vivirito*, 86 A.3d 119, 128 (N.J. 2014) (finding that a school principal was not liable for the negligence of a dog-owner whose dog attacked a pedestrian walking across the principal's school's grounds after school hours). And, as discussed above, the drafters of the TCA cautioned against the development of novel theories of liability. *See Saldana*, 646 A.2d at 527. Thus, the weight of the general policy of the TCA is against finding that the state exercised such a high degree of control over Sloan, an independent contractor, that she should be considered a servant of the state and thus a public employee under the TCA.

More specifically, this Court finds that, as a legal matter, CCR licensees are not so dissimilar from foster parents that the ruling stated in *New Jersey Property-Liability Ins. Guar. Ass'n* should not apply in this situation. The court in *New Jersey Property-Liability Ins. Guar. Ass'n* performed a thorough analysis of the role of foster parents under New Jersey's control test and found that even though the state exercises a significant degree of control over foster parents, foster parents should nonetheless not be considered state employees for purposes of the TCA because of their "considerable autonomy regarding the details of day-to-day supervision of the foster children." *New Jersey Property-Liability Ins. Guar. Ass'n,* 477 A.2d at 831. Plaintiffs emphasize that because a CCR licensee is supposed to be guided by the IHP of the person in her care that she does not have the same degree of autonomy as a foster parent. Having reviewed the copies of the IHPs submitted by Plaintiffs (O'Leary's IHPs from 2007 and 2008, ECF Nos. 41-21, 41-22), however, the Court does not agree with Plaintiff's assessment: while

34

the IHPs give important guidance regarding the habilitation services that O'Leary required, Sloan still exercised a great deal of control over her day-to-day supervision. In the foster care scenario, foster parents are ordinarily required by state law to take foster children to school, where the children follow a highly prescriptive routine under the state's care. Thus, despite the fact that the state exercises a significant degree of control over how a foster child is raised, foster parents are not public employees in the eyes of New Jersey courts. *New Jersey Property-Liability Ins. Guar. Ass'n,* 477 A.2d at 831. By the same token, while the IHP mandates a CCR resident's attendance at daycare programs, describes medications to be taken, and identifies self-care goals for the CCR resident, it does not control the day-to-day functions in a CCR home. Accordingly, a CCR licensee cannot be said to be a servant of the DDD, and so the DDD is not liable for Sloan's actions in this case.

### 3. Substantive State Law Claims

#### a) Count Four, Negligence

Defendants urge that they are entitled to summary judgment on Plaintiffs' negligence claims because Plaintiffs did not introduce any expert opinion on what would have been the applicable standard of care or how any of the Defendants may have violated the standard of care. (ECF No. 36-1, Defs.' Br., at 32–35). Plaintiffs counter that they will be able to properly establish the relevant duties of care and breaches thereof by reference to DDD policies and standards. (ECF No. 41, Pls.' Opp'n Br., at 36–38). While expert testimony is generally necessary to establish a duty of care in a malpractice case (*Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 579 (3d Cir. 2003)), industry standards can be used as evidence to establish a duty of care (*Davis v. Brickman Landscaping, Ltd.*, 98 A.3d 1173, 1181 (N.J. 2014)). There are enough factual disputes in this case that the Court is unable to determine at this time whether Plaintiffs' negligence claims are truly malpractice claims and what evidence is legally

required to establish Defendants' duty of care.  Plaintiffs' motion for summary judgment on this ground will be dismissed with leave granted for Plaintiffs to renew this argument through an appropriate motion at trial.

   *b) Count Seven, Violations of the New Jersey Civil Rights Act*

   In Count Seven, Plaintiffs state a claim for violations of the New Jersey Civil Rights Act ("NJCRA").  (ECF No. 1, Compl., at ¶¶ 142–48).  As this Court discussed in its opinion in the earlier, related case *Estate of Lydia Joy Perry v. Sloan*, 10-cv-4646 (AET), 2011 WL 2148813 (D.N.J. May 31, 2011), "[t]he NJCRA is a state law analogue to 42 U.S.C. § 1983—it creates a private right of action for the violation of civil rights secured by the Constitution and laws of the state of New Jersey and the Constitution and laws of the United States.  Accordingly, courts in this district have generally interpreted the NJCRA to be coextensive with its federal counterpart." *Estate of Lydia Joy Perry*, 2011 WL 2148813, at *2 (citing *Jefferson v. Twp. of Medford*, 2010 WL 5253296, at *3 (D.N.J. Dec. 16, 2010); *Celestine v. Foley*, 2010 WL 5186145, at *6 (D.N.J. Dec. 14, 2010); *Chapman v. New Jersey*, 2009 WL 2634888, at *3 (D.N.J. Aug. 25, 2009); *Slinger v. New Jersey*, 2008 WL 4126181, at *5 (D.N.J. Sept. 4, 2008) *rev'd in part on other grounds,* 366 Fed. App'x 357 (3d Cir. 2010).  Accordingly, the Court's ruling on Plaintiffs' § 1983 claims in this Opinion apply to their NJCRA claims: summary judgment is granted to Defendants on a state-created danger theory NJCRA claim against Briegel but denied on the same theory against Fenwick, and denied on special relationship theory NJCRA claim against both Briegel and Fenwick.

   However, as discussed in the above sections on Plaintiffs' § 1983 claims, Plaintiffs have limited their § 1983 claims to Briegel, Fenwick, and Grimes.  (ECF No. 41, Pls.' Opp'n Br., at 45).  Defendants' only argument regarding the NJCRA claims is that "for the reasons more specifically set forth above, since the [DDD] defendants are entitled to qualified immunity in the

federal claims, they are equally entitled to qualified immunity in the state claims." (ECF No. 36-1, Defs.' Br., at 11). This argument ignores the fact that Plaintiffs may have viable NJCRA claims against Velez, Ritchley, and Harbold that were not presented in Plaintiffs' § 1983 claims. Indeed, Plaintiffs have a lengthy discussion in their summary judgment opposition brief regarding how Velez, Ritchley, and Harbold showed deliberate indifference to DDD policies that contributed to the deprivation on O'Leary and Perry's state and federal Constitutional rights. (*See* ECF No. 41, Defs.' Opp'n Br., at 68–70). Defendants failed to address these arguments in either their initial summary judgment brief or their reply brief. Accordingly, the Court will deny Defendants' summary judgment motion on the NJCRA claim against Velez, Ritchley, and Harbold.

      *c)   Other State Law Claims*

Similarly, Defendants have presented no arguments on the substance of Plaintiffs' Wrongful Death Act and Survival Act claims (Count Five), claims for violations of the New Jersey Constitution (Count Six), or claims for violations of the Rehabilitation Act and the New Jersey Law against Discrimination (Count Eight). Summary judgment will be denied on these claims as well.

<u>CONCLUSION</u>

For the reasons stated above, Defendants' motion for summary judgment will denied on the following claims: Count One as against Briegel and Fenwick; Count Two as against Fenwick; Count Four as against Fenwick and Briegel; Count Five, stated by Plaintiff the Estate of Tara O'Leary, as against Briegel and Fenwick; Count Six as against Velez, Ritchley, Harbold, Briegel, and Fenwick; Count Seven as against Velez, Ritchley, Harbold, Briegel, and Fenwick; on the state law claims in Count Eight as against Fenwick and Briegel; and the ADA claims in Count Eight as against all Defendants.  Summary judgment is granted on all other claims.  An appropriate order will follow.

*/s/ Anne E. Thompson*         
ANNE E. THOMPSON, U.S.D.J.
